IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOEDI M. MASCIOLI | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-1655 |
| | ) | |
| v. | ) | |
| | ) | |
| ARBY'S RESTAURANT GROUP, INC. | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

CONTI, District Judge.

In this memorandum opinion, the court considers the motion for summary judgment filed by defendant Arby's Restaurant Group Inc. ("Arby's" or "defendant") pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. (Doc. No. 22.) Defendant seeks summary judgment in its favor with respect to all claims asserted by plaintiff Joedi Mascioli ("plaintiff" or "Mascioli"). In her complaint, plaintiff asserts claims for (1) interference with protected rights under the Family Medical Leave Act ("FMLA"), U.S.C. § 2601 *et seq.* (count one), (2) retaliation in violation of the FMLA for requesting FMLA-protected leave (count two), (3) disability discrimination in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* (count three), (4) retaliation in violation of the ADA for requesting leave due to her disability (count four), (5) disability discrimination in violation of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951 *et seq.* (count five), and (6) retaliation in violation of the PHRA for requesting leave due to her disability (count six).

After considering defendant's motion for summary judgment (Doc. No. 22), plaintiff's response (Doc. No. 32), the joint statement of material facts ("J.S.") (Doc. No. 37), and the parties' other submissions, the court will grant defendant's motion for summary judgment with respect to plaintiff's claims of FMLA interference and ADA and PHRA disability discrimination. Defendant's motion for summary judgment will be denied in all other respects.

### *Background*

Plaintiff was born on December 13, 1974, and resides in Acme, Pennsylvania. (Mascioli's Deposition ("Mascioli Dep.") at 9.) On July 9, 2004, defendant offered plaintiff a position. (Plaintiff's Joint Statement of Undisputed Facts ("J.S.Pl.")¶1[1]; Mascioli Dep. Def.'s Ex. 2.) She accepted and was hired as an assistant manager. (Defendant's Joint Statement of Undisputed Facts ("J.S.Def.")¶1; Brian Cassidy's Deposition ("Cassidy Dep.") at 32-33.) The offer stated plaintiff's anticipated start date was August 2, 2004. (Mascioli Dep., Def.'s Ex. 2.) Plaintiff did not start orientation, however, until August 12, 2004. (J.S.Pl.¶3; Mascioli Dep. at 28-29, Def.'s Ex. 1.) Plaintiff suffered from epilepsy, but did not mention her condition to the hiring officers because she feared that she would be discriminated against. (J.S.Pl.¶4; Mascioli Dep. at 99-100.) After training, plaintiff began working as a co-manager at defendant's restaurant located in Mt. Pleasant, Pennsylvania. (J.S.Def.¶3; Mascioli Dep. at 33.) Plaintiff was later transferred to a restaurant under construction located in Latrobe, Pennsylvania, where she was designated as the general manager. (J.S.Def.¶4; Cassidy Dep. at 35-37; Mascioli Dep. at 35.) Arby's considered

---

[1] The Joint Concise Statement of Material Facts consists of defendant's statement of material facts with plaintiff's answers, containing paragraphs 1-81 on pages 1-25, and plaintiff's statement of material facts with defendant's answers, containing paragraphs 1-37 on pages 25-38. To avoid any confusion that could arise from the duplicative paragraph numbers, citations to the joint statement will be referenced as J.S.Def. or J.S.Pl. followed by the appropriate paragraph number.

plaintiff a "good" employee and the best qualified individual for the Latrobe general manager position. (Cassidy Dep. at 35-37.) She worked as the general manager at the Latrobe location until defendant terminated her on August 22, 2005. (J.S.Def.¶5; Mascioli Dep. at 31, 34.)

Plaintiff was diagnosed with epilepsy when she was twelve or thirteen years old. (J.S.Pl.¶ 9; Mascioli Dep. at 5-8.) She typically has grand mal seizures. (J.S.Pl.¶12; Mascioli Dep. at 68-69.) When she has a seizure, she falls down and shakes and loses consciousness. (Id.) During the seizures, plaintiff cannot speak, walk or hear. (Mascioli Dec.¶8.) Plaintiff cannot walk immediately after the seizure, but can walk the next day. (Mascioli Dep. at 91.) Plaintiff experiences memory problems after a seizure. (Mascioli Dec.¶8.) Her seizures are triggered by stress and fatigue. (J.S.Pl.¶13; Mascioli Dep. at 72-73.) She takes medication, Depakote, which mitigates the effects of her disorder, but she still suffers from breakthrough seizures. (J.S.Pl.¶10; Mascioli Dep. at 6-9.) The medication has side effects such as fatigue. (Id.) Mascioli estimates that she has suffered approximately ten to one hundred seizures in her life and suffered seizures on October 29, 2007 and May 25, 2008. (J.S.Pl.¶¶ 13, 15, 16; Mascioli Dep. at 7-9; Mascioli Declaration ("Mascioli Dec.") ¶ 6.) Plaintiff can cook, do household chores, work in her yard, care for her personal hygiene, and walk and exercise at times. (Mascioli Dep. at 90-91.) She must limit her exposure to stress and fatigue, and cannot work excessively long hours, must eat meals at regularly scheduled intervals, cannot work at heights, and must have at least eight hours of sleep at night to avoid fatigue. (Mascioli Dec.¶8.) Plaintiff regularly worked in excess of forty hours per week. (Mascioli Dec.¶10.) Plaintiff was on the roof of the Mt. Pleasant Arby's store during her training. (Mascioli Dep. at 89.)

On August 2, 2005, plaintiff suffered a seizure when she was off work. (J.S.Pl.¶17; Mascioli Dep. at 63-64, 94-95.) She took off the following day of work. (Id.) When she

returned to work, she explained to her managerial team that she had epilepsy and that she had suffered a seizure. (J.S.Pl.¶18; Mascioli Dep. at 97-98; Cassidy Dep. at 57-63.) The director of operations, Brian Cassidy ("Cassidy"), came to the Latrobe restaurant on a regularly scheduled visit during the week after the seizure. (Mascioli Dep. at 63; Cassidy Dep. at 57-63.) Cassidy wanted to "visit her and talk to her to make sure she was okay." (Cassidy Dep. at 56.) Plaintiff informed him that she had epilepsy and suffered a seizure. (Cassidy Dep. at 57-59.) During a conversation with plaintiff, he admitted he was concerned about her ability to continue working. (J.S.Pl.¶19; Cassidy Dep. at 56.) Although Mascioli could not remember Cassidy's exact statement, Mascioli alleged that Cassidy made a comment to the effect that when he thinks of epilepsy, he thinks of someone in a wheelchair. (J.S.Pl.¶20; Mascioli Dep. at 73.) He expressed concern with her driving on company time. (J.S.P¶21; Mascioli Dep. at 74-75.) He inquired if he needed to hire an assistant manager to help with the Latrobe restaurant. (Cassidy Dep. at 61.) Mascioli answered that she did not need an assistant. (Id.) Plaintiff was not under investigation for any misconduct at the time Cassidy went to talk to plaintiff about her condition. (Cassidy Dep. at 56.)

Cassidy asked plaintiff if she would need additional time off from work. (J.S.Def.¶20; Mascioli Dep. at 75-83.) Plaintiff informed Cassidy and area supervisor, John Mangone ("Mangone"), that she would need time off work to undergo testing and that depending on the results of her testing, she may need additional time off work for treatment. (J.S.Pl.¶22; Mascioli Dep. at 75-83.) Although plaintiff told Cassidy and Mangone that she would need time off for testing and possibly for treatment, plaintiff never asked for any particular day or particular period of time off. (Mascioli Dep. at 83.) Other than informing Cassidy and Mangone that she may need to take time off, plaintiff did not ask for or otherwise indicate a need for any work

4

accommodation. (J.S.Def.¶21; Mascioli Dep. at 75-83.) In the time between the seizure and her termination, plaintiff did not undergo any medical testing. (J.S.Def.¶22; Mascioli Dep. at 81, 84.)

Shortly after plaintiff met with Mangone and Cassidy, it came to defendant's attention that the assistant manager, Christina Stofko ("Stofko"), had been receiving complaints that plaintiff had been making employees work off the clock without paying them. (J.S.Def.¶¶ 33, 34; Stofko's Deposition ("Stofko Dep.") at 18-26.) Stofko allegedly received the complaints starting in August 2005. (J.S.Def.¶33.)

Arby's distributed a RESPECT (respect quality, sexual harassment, pay issues, communication and teamwork) policy to all employees during orientation. (J.S.Def.¶8; Mascioli Dep. at 85.) Working off the clock violated Arby's RESPECT policy, which specifically required that employees were to be paid "for all hours worked." (J.S.Def.¶10, Mascioli Dep. at 85, Def.'s Ex. 5 at 39, 43). Plaintiff was aware of the RESPECT policy and reviewed it during training sessions. (J.S.Def.¶11; Mascioli Dep. at 84-86.) Stofko was never personally forced to work off of the clock nor did she ever witness plaintiff forcing an employee to perform and work off the clock. (J.S.Pl.¶25; Stofko Dep. at 19-20.) Cassidy asked Stofko to obtain allegations in writing from employees who worked off the clock. (J.S.Def.¶36; Stofko Dep. at 29-30.) Stofko instructed every employee who alleged that plaintiff forced him or her to work off the clock to write a statement that included the dates that plaintiff forced him or her to work off the clock and the tasks plaintiff forced him or her perform off the clock. (J.S.Def.¶37; Stofko Dep. at 35-36.) Six employees submitted written statements. (J.S.Def.¶¶ 39-44; Def.'s Exs. 6-11.) Stoner's written statement is dated August 18, 2005. (Def.'s Ex. 9.) The other written statements are not dated. (Def.'s Exs. 6-8, 10, 11.) Schmucker's written statement alleges plaintiff required her to

work until 4:30 p.m. on August 10, 2005 although she clocked out at 3:35 p.m. that day.  (Def.'s Ex. 7.)  On or around August 18, 2005, Stofko faxed the written statements to Mangone. (J.S.Def.¶45; Stofko Dep. at 45.)

Plaintiff alleges that when Cassidy initially interviewed the employees who provided written statements, all the employees denied that they were forced to work off the clock.  (J.S.Pl.¶ 26; Mascioli Dep. at 136-38.)  The day after the initial interviews, Mangone contacted shift manager Jeremy Scanlon ("Scanlon") and asked why the employees denied their written statements.  (Scanlon's Deposition ("Scanlon Dep.") at 28-30.)  Defendant alleges that Scanlon suggested that the employees did not want to make a "big fuss" out of plaintiff forcing them to work off the clock because they were afraid that plaintiff would cut their hours.  (Scanlon Dep. at 16.)

Defendant claims that shift managers Jen Schmucker ("Schmucker") and Patricia Ferry ("Ferry") never backed off their written statements.  (J.S.Def.¶53; Mangone's Deposition ("Mangone Dep.") at 30-31.)  Plaintiff argues with respect to Ferry's statement, however, that Ferry admitted in her deposition that plaintiff never forced her to work off the clock because plaintiff "didn't really tell me I had to stay, but she didn't really tell me I could go either."  (Ferry's Deposition ("Ferry Dep.") at 11, 15-18.)  With respect to Schmucker's statement, plaintiff argues that the written statement does not accuse plaintiff of forcing Schmucker to work off the clock.  (Def.'s Ex. 7.)  Defendant alleges that Kelli Stoner ("Stoner") later told Mangone and Cassidy that she was forced to work off the clock, but denied her statement because she needed her job and was afraid of plaintiff.  (J.S.Def.¶50; Mangone Dep. at 38.)  Plaintiff denies ever forcing any employee to work off the clock.  (J.S.Pl.¶28; Mascioli Dep. at 108-09, 123-28.)  She claims that when she had to order an employee to continue working to complete tasks after that employee already punched

out, she would instruct the employee to punch back in before completing the work. (Mascioli Dep. at 123-28; Mascioli Dec.¶10.)

When questioned with respect to her written statement at deposition, Ferry testified:

> Q       Who asked you to write [the written statement]?
>
> A       Christina [Stofko] had us write everything down.
>
> Q       Did she tell you why she wanted it written down?
>
> A       We had to turn it in to John [Mangone] and Brian [Cassidy]
> so they knew what was happening.

(Ferry Dep. at 15.) At his deposition, Mangone could not recall when he first became aware of the complaints that employees were working off the clock. (Mangone Dep. at 13.) Cassidy testified at his deposition that he learned of the complaints from Mangone, and that Mangone informed him of the complaints some time after plaintiff requested FMLA leave. (Cassidy Dep. at 72.)

Defendant claims it notified any employee who was forced to work off the clock that the employee would be paid if they notified Arby's for that time. (J.S.Def.¶80.) Except for shift manager Ferry, no employee notified defendant to make a claim for payment on time worked off the clock. (Ferry Dep. at 19-21).

Arby's had a progressive disciplinary policy, except in situations involving suspected dishonesty, drugs or alcohol, safety, or other aggravated offenses. (J.S.Pl.¶36; Cassidy Dep. at 46-47.) Plaintiff claims that under defendant's progressive disciplinary system, employees usually received oral and written warnings before being terminated. (Cassidy Dep. at 46-47.) The policy provided, however, that "any violation of this policy may result in disciplinary action up to and including termination." (Mascioli Dep. Def.'s Ex. 7.) Defendant claims that each

decision concerning whether to terminate an employee for a policy violation is made on a case-by-case basis. (J.S.Def.¶81; Cassidy Dep. at 101.)

On August 22, 2005, plaintiff was discharged. (J.S.Pl.¶30; Mascioli Dep. at 137-140.) Plaintiff's discharge occurred less than three weeks after plaintiff told Cassidy and Mangone that she may need time off. (J.S.Pl.¶30.)

Plaintiff believes that Mangone and Cassidy expressed discriminatory and rude comments towards women, blacks, and older individuals. (Mascioli Dep. at 111-15.) Plaintiff was able to perform the essential functions of her job without accommodations other than time off work for necessary testing and any possible follow-up treatment. (J.S.Def.¶30; Mascioli Dep. at 45, 78-82.)

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir.

2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party"). The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

## *Discussion*

## I. General

The current case revolves around defendant's termination of plaintiff on August 22, 2005. Plaintiff asserts six different claims: (1) interference in violation of the FMLA, (2) retaliation in violation of the FMLA, (3) disability discrimination in violation of the ADA, (4) retaliation in violation of the ADA, (5) disability discrimination in violation of the PHRA, and (6) retaliation in violation of the PHRA. Defendant moved for summary judgment on all six claims.

**II. FMLA Claims**

**A. General**

In her complaint, plaintiff asserts that defendant interfered with her exercise of her rights under the FMLA and retaliated against her for attempting to exercise her FMLA rights. Defendant counters, arguing that (1) plaintiff was not entitled FMLA benefits, (2) plaintiff never engaged in a protected activity under the FMLA, and (3) plaintiff was terminated for engaging in misconduct, not for attempting to exercise FMLA rights.

The FMLA was enacted by Congress in 1993, in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). The act was designed to provide a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and "accommodat[ing] the legitimate interests of employers." 29 U.S.C. § 2601(b)(1-2); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. § 2601(b)(1)) (holding that one of "[t]he primary purposes of the FMLA [is] to 'balance the demands of the workplace with the needs of families'. . . ."). The FMLA grants eligible employees the right to take up to twelve work weeks of leave during a twelve-month period for any of the following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
>
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.
>
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
>
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

(E) Because of any qualifying exigency (as the Secretary shall, by regulation, determine) arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on active duty (or has been notified of an impending call or order to active duty) in the Armed Forces in support of a contingency operation.

29 U.S.C. § 2612(a)(1)(A-E).  At the end of the leave period, the employee has the right to be restored to her former position or an equivalent position.  29 U.S.C. § 2614(a)(1).

An eligible employee under 29 U.S.C. § 2612(a)(1)(C) or (D) may be entitled to take FMLA leave intermittently:

on a reduced schedule when medically necessary.  The taking of leave intermittently or on a reduced leave schedule . . . shall not result in a reduction in the total amount of leave to which the employee is entitled . . . beyond the amount of leave actually taken.

29 U.S.C. § 2612(b).  The phrase "intermittent leave" is defined under the implementing regulations as "leave taken in separate periods of time due to a single illness or injury, rather than for one continuous period of time, and may include leave of periods from an hour or more to several weeks." 29 C.F.R. § 825.800.

### B. FMLA Interference Claim (count one)

In count one of her complaint, plaintiff alleges that defendant interfered with her FMLA benefits by (1) terminating her employment to prevent her from taking FMLA-protected leave, (2) failing to inform her of her FMLA rights, and (3) failing to restore her to her position after she returned from FMLA-qualifying leave.  In her brief in opposition to defendant's motion for summary judgment, however, plaintiff only argues her first allegation of FMLA interference.  Under the FMLA, "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).  In order for a plaintiff to establish a claim for an interference of FMLA rights, "the

employee only needs to show that he [or she] was entitled to benefits under the FMLA and that he [or she] was denied them." Callison, 430 F.3d at 119.

"Courts have refused to recognize a valid claim for interference in the absence of any injury." Alfiano v. Merck & Co., 175 F. Supp. 2d 792, 794 (E.D. Pa. 2001) (citing Voorhees v. Time Warner Cable Nat'l Div., No. 98-1460, 1999 U.S. Dist. LEXIS 13227 (E.D. Pa. 1999); Fry v. First Fidelity Bancorp., No. 95-6019, 1996 U.S. Dist. LEXIS 875 (E.D. Pa. 1996)). The scope of what constitutes interference is described in the applicable regulations as follows: "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). In Sommer v. The Vanguard Group, 461 F.3d 397 (3d Cir. 2006), the Court of Appeals for the Third Circuit noted:

> the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the FMLA. § 2615(a)(1). Such a claim is typically referred to as an "interference" claim, and is acknowledged to "set floors for employer conduct." Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005).

Id. at 399.

To state a claim for interference under the FMLA, a plaintiff must show that: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA. Lombardo v. Air Products and Chemicals, Inc., No. 06-1120, 2006 U.S. Dist. LEXIS 46077, at *11 (E.D. Pa. July 7, 2006) (citing Weisman v. Buckingham Twp., No. 04-4719, 2005 U.S. Dist. LEXIS 11696, at *11 (E.D. Pa. June 14, 2005)).

Pursuant to FMLA regulations, an employee must give an employer notice that he or she needs to take FMLA leave. 29 C.F.R. § 825.302; see Wilson v. Lemington Home for the Aged, 159 F. Supp. 2d 186, 191 (W.D. Pa. 2001). If the leave is foreseeable, the employee must provide thirty days' notice. Id. If thirty days' notice is not possible, then notice must be given "as soon as practicable." Id. An employee need not specifically mention the FMLA or assert rights under it to satisfy the notice requirement. 29 C.F.R. § 825.302(c); see Wilson, 159 F. Supp. 2d at 192. The employee need only state that leave is needed. Id.

In its motion for summary judgment, defendant argues that plaintiff was not denied an FMLA benefit to which she was entitled, because plaintiff's day off on August 3, 2005 was not FMLA qualifying, and, even if it was, she returned to the same position she previously held without incident. Defendant also argues there is no evidence it refused to authorize leave, or that it discouraged plaintiff from using or requesting leave.

Plaintiff agrees that defendant did not discourage plaintiff from taking a day off on August 3, 2005. Plaintiff's interference claim is instead based upon defendant's termination of her employment on August 22, 2005. Under the regulations:

> "[i]nterfering with" the exercise of an employee's rights would
> include, for example, not only refusing to authorize FMLA leave,
> but discouraging an employee from using such leave. It would
> also include manipulation by a covered employer to avoid
> responsibilities under FMLA . . . .

29 C.F.R. § 825.220(b). Plaintiff argues that the termination of her employment was a manipulative act by defendant for the purpose of avoiding its responsibility to provide plaintiff with FMLA leave, and thus termination of plaintiff interfered with her attempt to obtain FMLA leave in the future to undergo testing, and, if necessary, treatment. See Butler v. IntraCare Hosp. North, No. H-05-2854, 2006 WL 2868942, at *5 (S.D. Tex. Oct. 4, 2006) (holding that

employer's termination of employee after employee requested FMLA leave in the future was manipulation that sufficiently supported an FMLA interference claim).

There is confusion over whether an FMLA interference claim based upon the employer's termination of the employee in anticipation of future leave is in reality an FMLA retaliation claim. Several courts have treated such claims as FMLA retaliation claims. See, e.g., Dowling v. Citizens Bank, No. 2:05cv914, 2007 WL 2752178, at *5 (W.D. Pa. Sept. 19, 2007) (recognizing that many courts have framed claims that employer terminated employee in anticipation of leave as retaliation claims). The distinction between the two types of claims is significant. The employer "cannot justify [an FMLA interference action] by establishing a legitimate business purpose for its decision." Callison, 430 F.3d at 119-20. Liability is not dependent upon discriminatory intent, but rather is based upon the act of interference itself. Id. at 120. In contrast, an FMLA retaliation claim is subject to the burden-shifting analysis under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 146-47 (3d Cir. 2004). The court recognizes that, in some cases, courts have treated claims similar to count one of plaintiff's complaint as interference claims. See, e.g., Butler, 2006 WL 2868942, at *5. The court concludes, however, that plaintiff's interference claim is properly characterized as a retaliation claim.

Among the various rights provided by the FMLA is the right to reinstatement. 29 C.F.R. § 825.214. After taking FMLA leave, the employee is entitled to same position he or she held prior to leave, with the same pay, benefits, and other terms and conditions of employment. Id.; Conoshenti, 364 F.3d at 141 ("After an eligible employee returns from an FMLA leave, the

employee is entitled to be reinstated to his or her former position, or an equivalent one."). The

regulations elaborate upon the right to reinstatement:

> (a) An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. For example:
>
> > (1) If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise. An employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration. Restoration to a job slated for lay-off when the employee's original position is not would not meet the requirements of an equivalent position.
> >
> > (2) If a shift has been eliminated, or overtime has been decreased, an employee would not be entitled to return to work that shift or the original overtime hours upon restoration. However, if a position on, for example, a night shift has been filled by another employee, the employee is entitled to return to the same shift on which employed before taking FMLA leave.
> >
> > (3) If an employee was hired for a specific term or only to perform work on a discrete project, the employer has no obligation to restore the employee if the employment term or project is over and the employer would not otherwise have continued to employ the employee. On the other hand, if an employee was hired to perform work on a contract, and after that contract period the contract was awarded to another contractor, the successor contractor may be required to restore the employee if it is a successor employer.

29 C.F.R. § 825.216(a)(1)-(3). According to the regulations, if the employee is laid off and

terminated while on FMLA leave, the employee has no right to reinstatement or the right to

continue leave. The query here is whether the employer's responsibility to provide other FMLA

rights, such as the right to leave that has not yet commenced but is scheduled for a date or period in the future, similarly would stop upon termination of employment. This court finds that logic compels that it does stop upon termination the employer-employee relationship. The FMLA only entitles eligible *employees* to protection from interference.[2] After termination, the employer cannot discourage the use of FMLA leave, because there no longer is an employment relationship or ability of the individual to take FMLA leave.

In <u>Dressler Community Service Communications, Inc.</u>, 275 F. Supp. 2d 17 (D. Me. 2003), an employee sued his employer claiming FMLA interference and retaliation, because the employer eliminated his position as head of its human resources department. The plaintiff took intermittent leave under the FMLA after his wife experienced complications with ovarian cancer. <u>Id.</u> at 19-20. The employer had to layoff employees in light of serious financial troubles, and conducted a review of every department in the company. The employer decided to eliminate several positions within the human resources department, including the plaintiff's position. <u>Id.</u> at 20-21. With respect to the plaintiff's FMLA interference claim, the court noted that the employer did not interfere with his right to take FMLA leave, as the plaintiff was given all the leave he requested. Instead, the claim was based upon interference with the right to job restoration after taking leave. <u>Id.</u> at 23. Plaintiff's argument was that an adverse employment action (the layoff) was imposed because he took FMLA leave, which the district court believed was "inherently, a retaliation argument." <u>Id.</u> at 25. The court held that the plaintiff did not assert an interference claim, but "only a retaliation claim masquerading as one." <u>Id.</u> The district court observed that "[i]f

---

[2] The regulations promulgated by the United States Department of Labor provide that the determination whether the employee is eligible "must be made as of the date the FMLA leave is to start." 29 C.F.R. § 825.110(d). For that reason, the FMLA protects non-eligible employees who give notice of leave to commence once they become eligible. <u>See Beffert v. Pennsylvania Dept. of Public Welfare</u>, No. Civ.A.05-43, 2005 WL 906362, at *2-3 (E.D. Pa. Apr. 18, 2005). Mascioli would have been employed for at least twelve months by Arby's on the date her leave would have begun, if she was still employed. Plaintiff's employment was terminated, however, before the leave would start, severing the employer-employee relationship.

iring-is-a-denial-of-restoration-argument [sic] is simply a clever way of trying to shortcut his burden of persuading the Court that sufficient evidence exists in the record for a factfinder to reject [the employer's] justification and to conclude, instead, that [the plaintiff] was terminated in retaliation for exercising his FMLA rights." <u>Id.</u>

Plaintiff's interference claim is different from that asserted by the plaintiff in <u>Dressler</u>, because plaintiff claims her right to FMLA leave was interfered with after she requested leave; this case is not a reinstatement case. Even so, the court concludes that the same reasoning applied in the <u>Dressler</u> case applies here. Plaintiff's argument with respect to her interference claim is that defendant took an adverse employment action because she requested leave. This is, in essence, identical to her retaliation claim asserted in count two. The court notes that with respect to her interference claim, plaintiff stated in her brief in opposition to the summary judgment motion that "[f]ederal case law and the DOL regulations make clear that employers cannot use the taking of leave as a negative factor in an employment action such as hiring, promotions, or disciplinary matters," citing several cases including <u>Conoshenti</u>. (Pl.'s Br. Opp. Summ. J. (Doc. No. 32) at 7). In <u>Conoshenti</u>, the plaintiff claimed that the taking of leave was used by the employer as a negative factor in its decision to discharge the plaintiff. <u>Conoshenti</u>, 364 F.3d at 146-47.[3] The Court of Appeals for the Third Circuit addressed this claim as a retaliation claim under 29 C.F.R. 825.220(c), and not as an interference claim. <u>Id.</u> at 146-48. Since plaintiff's interference claim should be properly characterized as a retaliation claim, the

---

[3] The confusion surrounding whether to treat the claim as an interference claim, a retaliation claim, or both, arose due to discrimination and retaliation being included in the section of the regulations concerning interference. 29 C.F.R. § 825.220. Liability for retaliation in response to exercising or attempting to exercise FMLA rights is predicated upon 29 C.F.R. § 825.220(c). <u>Conoshenti</u>, 364 F.3d at 146-47 n.9. The Court of Appeals for the Third Circuit stated "[e]ven though 29 C.F.R. § 825.220(c) appears to be an implementation of the 'interference' provisions of the FMLA, its text unambiguously speaks in terms of 'discrimination' and 'retaliation,' and we shall, of course, apply it in a manner consistent with that text." <u>Id.</u>

interference claim will be denied as moot in light of the assertion by plaintiff of her retaliation claim.

### C. FMLA Retaliation Claim (count two)

Plaintiff asserts a claim of retaliation under the FMLA. "To prove FMLA retaliation, an employee must show that his [or her] employer *intentionally* discriminated against him [or her] for exercising an FMLA right." Martin v. Brevard County Sch., 543 F.3d 1261, 1267 (11th Cir. 2008). The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with "conscious intent to discriminate." McDonnell Douglas, 411 U.S. at 800-02. The Supreme Court's McDonnell Douglas burden-shifting framework for Title VII retaliation claims is applicable to FMLA retaliation claims. In Wilson, 159 F. Supp. 2d at 194-95, the court found that "in analyzing claims for retaliation under the FMLA, the court should look to the legal framework established in Title VII claims." See Curcio v. Collingswood Bd. of Educ., No. CIVA 04-5100, 2006 WL 1806455, at *11 (D.N.J. June 28, 2006) (recognizing the Title VII framework applies to FMLA retaliation claims).

The familiar McDonnell Douglas framework requires a plaintiff alleging retaliation claims under the FMLA to first establish a prima facie case of retaliation. The prima facie case, the elements of which depend upon the type of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). In so doing, the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Id. at 254.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate,

nondiscriminatory reason for the adverse employment decision.  Simpson v. Kay Jewelers Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998).  The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie, 32 F.2d 759, 763 (3d Cir. 1994) (emphasis added).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "the McDonnell Douglas framework–with its presumptions and burdens"– disappear[s], . . . and the sole remaining issue [i]s 'discrimination *vel non.*' "  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) (citations omitted).  The plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

## 1. Prima Facie Case for Retaliation

An FMLA retaliation claim is contemplated by section 825.220(c) of the regulations implementing 29 U.S.C. §2615(a).  29 C.F.R. §825.220(c);[3] see Conoshenti, 364 F.3d at 146 (citing 29 C.F.R. §825.220(c) and noting that FMLA retaliation claims arise under 29 U.S.C.§ 2615(a), the interference provision of the FMLA).  To establish a prima facie case for retaliation

---

[3] 29 C.F.R. § 825.220(c) provides:

> The [FMLA]'s prohibition against "interference" prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights.  For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave.  By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions; nor can FMLA leave be countered under "no fault" attendance policies.

under the FMLA, a plaintiff must show that (1) he or she is protected under the FMLA, (2) he or she suffered an adverse employment decision, and (3) the adverse decision was causally related to plaintiff's exercise of his or her FMLA rights.  Baltuskonis v. US Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999); see Conoshenti, 364 F.3d at 146.  The parties do not dispute that plaintiff suffered an adverse employment decision; the termination of plaintiff's employment on August 22, 2005 satisfies the second element.  Termination from employment qualifies as an "adverse employment action."  See Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006) (applying Title VII standard for adverse employment action "[b]ecause 'the FMLA's [retaliation] clause' is derived from Title VII and is [thus] intended to be construed in the same manner") (quoting Duckworth v. Pratt Whitney, Inc., 152 F.3d 1, 9 n.8 (1st Cir. 1998) (certain brackets in original).

### a. Protected Under the FMLA – First Element

There is a genuine issue of material fact with respect to whether plaintiff meets the first requirement.  Defendant argues that plaintiff was not eligible for FMLA protected leave when she took a day off of on August 3, 2005 after suffering a seizure, because she was not yet employed for twelve months.  Defendant argues that even for the requested leave during the period in which plaintiff was eligible, plaintiff did not request specific dates upon which she would require such leave to undergo testing and possible treatment.  Defendant believes plaintiff was not protected under the FMLA and she did not engage in any protected activity.

Plaintiff's absence on August 3, 2005, was not a leave of absence protected under the FMLA.  Plaintiff's attempt to exercise her right to FMLA leave on a later date, however, was protected under the FMLA.  As a general rule, an employee must provide notice to the employer in order to be entitled to FMLA benefits.  Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d

398, 401 (3d Cir. 2007). An employee seeking FMLA leave for a serious health condition "shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave under such subparagraph, except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B). Defendant argues that even if plaintiff was eligible for FMLA-protected leave to undergo future testing and treatment, she did not give adequate notice to defendant that she would require such FMLA leave. Plaintiff told Cassidy and Mangone that she would need time off for testing and possibly for treatment, but plaintiff admitted she never requested specific days or periods off. Defendant argues that plaintiff's failure to inform defendant of dates or estimated dates when time off would be taken renders the notice inadequate.

In <u>Sarnowski</u>, an employee who suffered chronic heart problems missed approximately six weeks of work for quintuple coronary artery bypass surgery. <u>Sarnowski</u>, 510 F.3d at 400. A few months after returning to work, the employee experienced further heart problems, and his doctor advised him to wear a heart monitor for thirty days. Depending upon the results of the monitor, he might have needed further surgery. The employee informed his supervisor that he would wear a monitor and there was a possibility of additional surgery. <u>Id.</u> Eight days after informing his supervisor, the employee was terminated for performance-related reasons. <u>Id.</u> The employee claimed the employer interfered with FMLA-protected leave, and the employer moved for summary judgment, arguing that it did not have adequate notice. The Court of Appeals for the Third Circuit concluded that, when the facts were viewed in light most favorable to the employee, the employer had sufficient notice for the requirements of the FMLA to be satisfied.

Id. at 403.  The court of appeals stated that, under the regulations, simple verbal notification is

sufficient, and also that:

> [i]n providing notice, the employee need not use any magic words.
> The critical question is how the information conveyed to the
> employer is reasonably interpreted.  An employee who does not
> cite to the FMLA or provide the exact dates or duration of the
> leave requested nonetheless may have provided his employer with
> reasonably adequate information under the circumstances to
> understand that the employee seeks leave under the FMLA.

Id. at 402.  The court of appeals noted that, in most situations in which courts have found notice

to be inadequate, the pivotal fact was that the employee failed to convey the reason for needing

leave.  Although in Sarnowski the need for surgery was not a certainty, the employee made clear

that his health problems were ongoing.  Id. at 403.

This case is similar to Sarnowski.  Plaintiff informed her supervisor of the probable need

for future time off due her epilepsy, in order to undergo testing and possible treatment.  Plaintiff

failed to demonstrate definitive dates upon which leave was requested, but, as explained in

Sarnowski, the provision of precise dates is not necessary.  Plaintiff communicated her medical

condition to defendant, and conveyed that future time off may be necessary because of her

medical condition.  Such evidence, when viewed in plaintiff's favor, creates a genuine issue of

material fact about whether plaintiff provided notice pursuant to the FMLA.  Viewing the

evidence of record in the light most favorable to the nonmoving party, this court finds that

plaintiff adduced sufficient evidence to meet the first requirement of her retaliation claim.

### b. Adverse Employment Decision Was Causally Related to Plaintiff's Exercise of Her Rights – Third Element

The third and last requirement for a prima facie case for retaliation is that a casual

connection must exist between the adverse decision and plaintiff's exercise of her FMLA rights.

Defendant argues that plaintiff's FMLA retaliation claim fails, because she cannot demonstrate a

causal connection between the adverse employment decision to terminate her employment and her protected activity of requesting future leave for testing and treatment. Plaintiff responds that the timing alone between the adverse decision and the protected activity in this situation is unusually suggestive and demonstrates the causal link.

The United States Court of Appeals for the Third Circuit articulated two main factors that are relevant with respect to establishing a causal link to satisfy a prima facie case of retaliation: (1) timing or (2) evidence of ongoing antagonism. Abramson v. William Patterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period"). As this court stated in Sabbrese v. Lowe's Home Centers, Inc., 320 F. Supp. 2d 311 (W.D. Pa. 2004):

> The United States Court of Appeals for the Third Circuit is somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. See Woodson v. Scott Paper Co., 109 F.3d 913, 920-921 (3d Cir. 1997) ("Temporal proximity is sufficient to establish the causal link"); Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); but c.f. Quiroga v. Hasbro, Inc., 934 F.3d 497 (3d Cir. 1991) (following bench trial, court determined "as a matter of fact" the timing of the plaintiffs discharge alone did not raise an inference of retaliation); Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where 19 months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). Timing, however, in conjunction with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000). For example, timing combined with evidence of inconsistent reasons given by an employer for an

employee's termination was held to satisfy the causation prong of the prima facie case.  Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986).  See also Abramson, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); see also EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir.1997), cert. denied, 522 U.S. 1147 (1998).

Id. at 323.

Here, plaintiff did not allege the date upon which she informed her supervisors that she would likely need FMLA leave in the near future, although it was sometime after she returned to work from her August 3, 2005 absence.  Plaintiff was terminated on August 22, 2005.  The time span, therefore, could not have been more than three weeks.  Plaintiff does not suggest there is any evidence of record of ongoing antagonism, so the issue is whether the span of time between the protected activity and the employment decision is unusually suggestive.

The degree of suggestiveness of the time span depends on the particular facts of the situation.  Emerick v. Norfolk Southern Ry. Co., No. CIVA 3:03-266, 2006 WL 3692595, at *13 (W.D. Pa. Dec. 12, 2006).  "When there may be a valid reason why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation."  Zelinski v. Pa. State Police, 108 F. App'x 700, 706 (3d Cir. 2004).  Here, the court notes that a three-week span is suggestive of a causal connection.  Furthermore, the court notes that, construing the evidence of record in favor of plaintiff, defendant's alleged legitimate business reason for firing plaintiff may have been created after plaintiff requested FMLA leave.  Stoner's written statement is dated August 18, 2005.  The other written statements are not dated.  Schmucker's written statement alleges plaintiff required her to work until 4:30 p.m. on August 10, 2005 although she clocked out at 3:35 p.m. that day, and therefore it most

likely was written after plaintiff requested leave. When questioned with respect to her written statement at deposition, Ferry testified that Stofko asked the employees to write down their allegations of being forced to work off the clock, and to turn them in to Mangone and Cassidy. Ferry never testified as to the date she wrote her statement. At his deposition, Mangone could not recall when he first became aware of the complaints that employees were working off the clock, and Cassidy testified at his deposition that he learned of the complaints from Mangone. Cassidy further testified that Mangone informed him of the complaints some time after plaintiff requested FMLA leave. Viewing the evidence in plaintiff's favor, Cassidy and Mangone might have gathered the information to support its alleged reason for plaintiff's termination after she requested FMLA leave, when in reality defendant's intent was to terminate plaintiff because she requested leave. The court concludes a reasonable jury could find that there was a plausible reason why the adverse employment action was not taken immediately, and could weigh that factor in favor of causation. While this is a somewhat close question, the court determines for purposes of this motion that plaintiff adduced sufficient evidence to establish a prima facie case of retaliation.

### 2. Burden-Shifting

Under step two of the <u>McDonnell Douglas</u> framework, where the plaintiff establishes a prima facie case of discrimination, a presumption arises that the employer unlawfully discriminated against the employee, shifting the burden of production to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>see</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993). "[A]lthough the <u>McDonnell Douglas</u> presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

against the plaintiff remains at all times with the plaintiff." St. Mary's Honor Ctr., 509 U.S. at 507 (citing McDonnell Douglas, 450 U.S. at 253).

A defendant is not required to meet this burden by a preponderance of the evidence, but rather:

> the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.

Burdine, 450 U.S. at 257. If the burden of production is met by the defendant, the ultimate burden of persuasion shifts back to the plaintiff to prove "that the alleged reasons proffered by the defendant were pretextual and that the defendant intentionally discriminated against the plaintiff." Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989) (citing Burdine, 450 U.S. at 252-53).

At the summary judgment stage, the shifting burden requires the plaintiff to "point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (the "two-prong test"). To survive summary judgment, the plaintiff must submit evidence that allows the fact finder "reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Id. (citations omitted). The nonmoving plaintiff is required to "demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them 'unworthy of credence' and hence infer that 'the employer did not act for [the asserted] non-discriminatory

reasons." Id. (citations omitted). The necessary evidence may consist of the evidence submitted by the plaintiff in the prima facie case, as well as additional evidence rejecting the employer's legitimate nondiscriminatory reason as pretextual. Id. at 764.

In this case, defendant asserts that plaintiff was not terminated because she requested leave pursuant to the FMLA, but rather because plaintiff violated Arby's RESPECT policy for forcing employees to work off the clock. Defendant's assertion is supported by evidence in the record that satisfies defendant's burden of production under McDonnell Douglas, including the written complaints. With respect to the final part of the test, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, here plaintiff's resignation, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." Fuentes, 32 F.3d at 763.

As noted, the United States Court of Appeals for the Third Circuit in Fuentes developed the two-prong test that is implicated when the employer articulates a legitimate, nondiscriminatory reason for the plaintiff's termination. The two prongs of the Fuentes test are alternative tests. If one prong is satisfied then a plaintiff may survive summary judgment. Id. at 764. The two prongs are distinct and have been analyzed under different standards in subsequent court decisions. The first prong focuses on whether the plaintiff submitted evidence from which a fact finder could reasonably disbelieve the employer's articulated legitimate reasons for the plaintiff's termination. The second prong of the Fuentes framework requires the court to determine whether the plaintiff presented sufficient evidence of pretext; i.e, whether there is evidence of record, that "an invidious discriminatory reason was more likely than not a motivating

or determinative cause of the employer's action." Fuentes, 32 F.2d at 764. Here, only the first prong needs to be addressed because plaintiff adduced sufficient evidence to meet that prong.

### 3. Pretext

Under the first prong, the plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the proffered non-discriminatory reason 'did not actually motivate' the employer's action." Simpson, 142 F.3d at 644. The district court under this prong must focus on the legitimate, nondiscriminatory reason offered by the employer. Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531(3d Cir. 1992) (stating that a plaintiff "does not establish pretext . . . by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon"). The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination. Ezold, 983 F.2d at 527.

In the instant matter, defendant claims that plaintiff was terminated because she forced employees to work off the clock. Plaintiff makes six arguments that defendant's alleged business reason is pretextual. First, plaintiff denies that she violated defendant's policy and forced employees to work off the clock. She claims that when she had to order an employee to continue working to complete tasks after that employee already punched out, she would instruct the employee to punch back in before completing the work. Second, plaintiff argues that defendant failed to maintain records that the employees who complained of working off the clock were ever paid for that time. Plaintiff believes defendant never paid the complaining employees, and defendant's failure to pay proves that defendant did not truly believe the employees worked off

the clock.  Third, plaintiff argues defendant offered inconsistent explanations regarding its investigation.  Plaintiff argues that Cassidy and Mangone testified at their depositions that, on the day Scanlon conducted interviews of the complaining employees, Scanlon told Cassidy and Mangone that the employees denied their statements out of fear of plaintiff.  In contrast, plaintiff notes that Scanlon testified at his deposition that he did not speak with Mangone until the day after the interviews.  Fourth, plaintiff argues defendant "was building a case against" her, so that defendant could allege it acted based upon a legitimate business reason.  Fifth, Cassidy points to an alleged discriminatory comment made by Cassidy after he learned plaintiff had a seizure, in which Cassidy stated when he thinks of epilepsy, he thinks of someone in a wheelchair.  Sixth, plaintiff argues defendant failed to follow its progressive disciplinary policy with respect to her misconduct.

Viewing the evidence in the light most favorable to the nonmoving party, the court must conclude that plaintiff adduced sufficient evidence that defendant's asserted reason for termination from her employment was unworthy of credence.  Plaintiff's own denial that she did not violate defendant's policy is insufficient evidence of pretext.  Defendant need only believe that the alleged misconduct that forms the basis for the legitimate business reason occurred; the alleged misconduct did not have to actually occur.  Fuentes, 32 F.3d at 765.  Defendant was aware, however, that several of the complaining employees denied their written statements.  The renunciation of several of the employees' complaints is evidence, if viewed in light most favorable to the nonmoving party, that defendant did not believe plaintiff forced employees to work off the clock.  In addition, plaintiff adduced sufficient evidence that defendant "was building a case against" her, by fabricating a supposed business reason for its decision.  In Fuentes, the Court of Appeals for the Third Circuit stated:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the
> employer's proffered legitimate business reasons must allow a
> factfinder reasonably to infer that . . . the employer's proffered non-
> discriminatory reasons . . . was either a *post hoc* fabrication or
> otherwise did not actually motivate the employment action (that is,
> the proffered reason is pretext).

Id. at 764 (citations omitted). There is no evidence of record that defendant began investigating

plaintiff's misconduct prior to her disclosure of her epilepsy and requesting leave. As analyzed

earlier, the evidence in the record when viewed in plaintiff's favor is sufficient for a reasonable

finder of fact to conclude that defendant attempted to create after-the-fact evidence to support its

stated reason for plaintiff's termination. See Lawrence v. Nat'l Westminster Bank New Jersey, 98

F.3d 61, 67 (3d Cir. 1997) (holding that, among other evidence of pretext, a memorandum

detailing reasons why an employee was not 'the right person' written after the employee was

terminated supported the inference that the employer did not act for a nondiscriminatory reason);

see also White v. Community Care, Inc., No. 07-1507, 2008 WL 5216569, at *15 (W.D. Pa. Dec.

11, 2008) (holding that post hoc fabrication supports a finding that a proffered nondiscriminatory

reason is pretextual).

Because plaintiff presented sufficient evidence to discredit defendant's proffered reason

for plaintiff's termination, the court need not address the second prong of the Fuentes test.

After reviewing the undisputed material facts of record, viewing all disputed facts in the

light most favorable to plaintiff and drawing all reasonable inferences in favor of plaintiff, the

court concludes that plaintiff adduced sufficient evidence for a reasonable fact finder to render a

verdict in favor of plaintiff on her retaliation claim under the FMLA. Summary judgment,

therefore, will be denied with respect to plaintiff's retaliation claim under the FMLA.

**III. ADA and PHRA[4] Claims**

  **A. Disability Discrimination Claims (counts three and five)**

   **1. Burden-Shifting Framework**

  The Supreme Court recognized that in employment discrimination cases, it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 800-02.  One manner in which a plaintiff can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination.  <u>Burdine</u>, 450 U.S. at 253.  In cases where there is no direct evidence of discrimination, the United States Court of Appeals for the Third Circuit applies the burden-shifting analysis set forth in <u>McDonnell Douglas</u>.  <u>See</u> <u>Barber v. CSX Distrib. Servs.</u>, 68 F.3d 694 (3d Cir. 1995).  Under this analysis, a plaintiff must first establish a prima facie case of discrimination.  <u>Burdine</u>, 450 U.S. at 254; <u>McDonnell Douglas</u>, 411 U.S. at 802.

  If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production–but not the burden of persuasion–shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision.  <u>Simpson</u>, 142 F.3d at 644 n.5. The defendant can satisfy this burden by offering evidence of a nondiscriminatory reason for its action.  <u>Fuentes</u>, 32 F.3d at 763.  Once the defendant offers a legitimate, nondiscriminatory reason for the challenged conduct, the plaintiff has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination.  <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d

---

[4] Pennsylvania courts interpret the PHRA in accord with the ADA.  <u>Stultz v. Reese Bros., Inc.</u>, 835 A.2d 754 (Pa. Super. Ct. 2003); <u>Imler v. Hollidaysburg Am. Legion Ambulance Serv.</u>, 731 A.2d 169 (Pa. Super. Ct. 1999), <u>appeal denied</u>, 743 A.2d 920 (1999).  The PHRA claims will be subject to the same determination made with respect to the ADA claims.

403, 410 (3d Cir. 1999). The <u>McDonnell Douglas</u> burden-shifting analysis applies to discrimination cases under the ADA. <u>Walton v. Mental Health Ass'n of Southeastern Pennsylvania</u>, 168 F.3d 661, 667-68 (3d Cir. 1999).

### 2. Prima Facie Case

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order to establish a prima facie case of discrimination under the ADA, a plaintiff must prove the following:

> (1) he [or she] is a disabled person within the meaning of the ADA; (2) he [or she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he [or she] has suffered an otherwise adverse employment decision as a result of the discrimination.

<u>Gaul v. Lucent Techs.</u>, 134 F.3d 576, 580 (3d Cir. 1998) (citing <u>Shiring v. Runyon</u>, 90 F.3d 827, 831 (3d Cir. 1996)). The burden of making this prima facie case is light. <u>Burdine</u>, 450 U.S. at 253. The parties dispute whether there is sufficient evidence to create a genuine issue of material fact as to all three prima facie elements.

### a. Disabled within the meaning of the ADA – First Element

Defendant asserts that plaintiff is not a disabled person within the meaning of the ADA. The ADA defines a "qualified individual with a disability" under the act as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such person holds or desires." 42 U.S.C. § 1211(8). The term "disability" is defined under the ADA as: "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an

impairment; or (c) being regarded as having such an impairment." 2 U.S.C.§12102(2).[5]  Plaintiff

argues that there are genuine issues of material fact with respect to whether she has an actual

physical impairment that substantially limits one or more of her major life activities, and to

whether defendant regarded her as having an actual impairment.

### i. Actual Impairment

The United States Supreme Court developed a three-part framework to determine

whether a plaintiff has a "disability" under the ADA.  Bragdon v. Abbott, 524 U.S. 624 (1998).

First, courts are to determine whether the plaintiff suffered from a physical or mental

impairment.  Id. at 630.  The court assumes plaintiff's epilepsy qualifies as an impairment;

defendant has not challenged otherwise.[6]  See Sterling v. McKesson Automation, Inc., No

2:04cv1470, 2006 WL 2792203, at *4 (W.D. Pa. Sept. 26, 2006) (assuming epilepsy is an

impairment).  Second, the court must identify the major life activity upon which the plaintiff

---

[5] The PHRA definition of "handicap or disability", 43 PA. CONS. STAT. § 955(a), is "coextensive" to the definition of "disability" under the ADA.  See Fehr v. McLean Packaging Corp., 860 F.Supp. 198, 200 (E.D. Pa. 1994).  Under the PHRA, the term "handicap or disability," with respect to a person, means:

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities;
>
> (2) a record of having such a disability; or
>
> (3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance, as defined in section 102 of the Controlled Substances Act (Public Law 91-513, 21 U.S.C. § 802)

43 PA. CONS. STAT. § 954(p.1)(1-3).

[6] Pursuant to 29 C.F.R. § 1630.2(h)(1), a "physical or mental impairment" is defined as:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
>
> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

relied and "determine whether it constitutes a major life activity under the ADA."[7] Bragdon, 524 U.S. at 632. Finally, the court must inquire whether the plaintiff's impairment "substantially limited" a major life activity identified in step two. Id. In order to resolve defendant's pending motion for summary judgment, the court is required to determine step three within the Supreme Court's framework, i.e., whether plaintiff's impairment substantially limited her in a major life activity.

A major life activity is "substantially limited" if the individual is "[u]nable to perform a major life activity that the average person in the general population can perform," or if she is "[s]ignificantly restricted as to the condition, manner or duration under which [the] individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The regulations enumerate several factors to be considered in determining whether an individual is substantially limited in a major life activity: "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Plaintiff asserts that, as a result of her epilepsy, she was substantially limited in the major life activities of speaking, hearing, walking, seeing, and thinking. She must take medication on a daily basis to control her epilepsy and limit seizures. Despite her medication, plaintiff occasionally suffers breakthrough grand mal seizures; plaintiff suffered seizures on August 2, 2005, October 29, 2007, and May 25, 2008. During a seizure, plaintiff falls down, shakes, and loses consciousness. Following a seizure, plaintiff typically experiences short-term memory loss

---

[7] Defendant did not argue that any of the major life activities that plaintiff asserted in support of her argument that she has an actual disability are not qualifying major life activities.

and fatigue, and she is limited in her ability to concentrate and walk for a period of twenty-four to forty-eight hours. Plaintiff must limit her exposure to stress and fatigue, because these trigger seizures.

Defendant argues that plaintiff is not limited in any major life activities, based upon her deposition testimony that she can do laundry, cook, clean, do general household chores, landscape her yard, and shower. Defendant also argues plaintiff is not disabled because her epilepsy is controlled by medication.

There is no hard and fast rule with respect to whether an epileptic is substantially limited in major life activities. An epileptic is not disabled per se under ADA. See Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 937-38 (3d Cir. 1997) ("we must stress that [an individual] cannot be considered disabled merely because he [or she] is epileptic"). The outcomes of the decisions dealing with the issue whether an epileptic is disabled under the ADA vary. In Popko v. Pennsylvania State University, 84 F. Supp. 2d 589 (M.D. Pa. 2000), an employee filed suit claiming unlawful discrimination and retaliation under the ADA and the PHRA based upon her epilepsy. Id. at 590. The employee successfully treated her condition with a strict sleep regimen. Her last grand mal seizure took place sometime between 1975 and 1980. Even when she did not get a full night's sleep, she experienced at most a "shakiness" in the morning which quickly dissipated. Id. at 593. Because the condition was successfully treated, the court held that the employer's epilepsy did not substantially limit any major life activities. The employee, however, additionally argued that her epilepsy substantially interferes with the major life activity of sleeping, since she must average seven to eight hours of sleep per night. The court noted that sleep has been held to be a major life activity, but sleep is only substantially limited in the case of insomniacs, and not in the case of those who cannot stay up as late or as

often as they would prefer.  The employee, therefore, was not limited in the major life activity of sleep.  Id. at 593-94.

    In Rowles v. Automated Production Systems, Inc., 92 F. Supp. 2d 424 (M.D. Pa. 2000), an employee claimed his employer violated the ADA by terminating his employment because of his epilepsy.  Id. at 427.  The employer argued that, because the employee's epilepsy was controlled by medication, he was not substantially limited in certain major life activities.  The employee conceded that the medication controlled his epilepsy, but he still experienced breakthrough seizures about once a year.  Id. at 428-29.  The employee argued that, even when medicated, he was limited in his daily activities; he had to limit his exposure to stress and fatigue, limit his hours working, eat meals at regularly scheduled intervals, and have at least eight hours of sleep per night.  Id.  The court held that, when viewing the employee's limitations as a whole, there was sufficient evidence to withstand a motion for summary judgment.  Id. at 429.  The court was not persuaded by the employer's contention that "[t]he one seizure a year plaintiff might suffer does not significantly interfere with any major life activity. . . . Although one may conclude that such limited seizure activity is not substantially limiting, the court cannot say, as a matter of law, that no reasonable juror could conclude otherwise."  Id.  The court also believed that the evidence of the precautions the employee had to take was also evidence that he was substantially limited, when those precautions were collectively viewed.  Id.

    In EEOC v. Sara Lee Corp., 237 F.3d 349 (4th Cir. 2001), the EEOC sued an employer, alleging the employer discriminated against one of its former employees who had epilepsy in violation of the ADA.  Id. at 350-51.  The former employee first became aware of her disorder when she experienced seizures in her sleep.  She eventually experienced both daytime and nighttime seizures.  The nighttime seizures occurred during her sleep and involved shaking,

kicking, salivating, and bedwetting. The employee was unaware she had the seizures, but the next day, she would feel as if she did not sleep. The daytime seizures were milder, and only lasted a couple of minutes. The daytime seizures involved shaking and her face taking on a blank expression. During the attack, she was unaware of and unresponsive to her surroundings. The employee could feel the daytime seizures about to start, and afterwards she could return to the activities she was doing immediately prior to the seizure. The employee was diagnosed with a type of epilepsy that does not cause grand mal seizures. The diagnosing doctor told her that she would live with epilepsy the rest of her life. Id. at 351. The EEOC claimed that the seizures were a disability under the ADA, pursuant to the "intermittent manifestation" theory. The Court of Appeals for the Fourth Circuit held that the symptoms of a disability that manifest upon an intermittent basis may be relevant to determining if the disability is substantially limiting, but the intermittent manifestation (the seizures in the case) cannot be the disability itself. The limitations associated with the intermittent manifestation of the disease are to be judged the same way as all other potential limitations. Id. at 352. The EEOC argued that the employee was substantially limited in three major life activities–sleeping, thinking, and caring for herself.

The court of appeals held that although she did not sleep well when she experienced seizures, the EEOC did not prove that her lack of sleep was significantly worse than that of the general population. She was not substantially limited in thinking, since her mild form of epilepsy caused her to be forgetful on occasion, but such episodes did not rise to the level of a substantial limitation. With respect to her ability to care for herself, the court of appeals emphasized that her seizures were not of the grand mal variety and that they relatively infrequently occurred. She continued to care for her son, drive, and perform her job

responsibilities.  Based upon this evidence, the court of appeals believed she was not substantially limited in caring for herself.  Id. at 352.

In Robinson v. Lockheed Martin Corp., 212 F. App'x 121 (3d Cir. 2007), an employee filed suit under the ADA and PHRA claiming that he was discriminated against because of his "seizure disorder." Id. at 124.  The employee alleged that this disorder substantially limited him in sporting activities, cooking, tub baths, driving, stress, heights, and social issues.  Id.  He testified, however, that the seizure disorder did not prevent him from engaging in the sports he most frequently participated in prior to be diagnosed.  His cooking habits did not substantially change from the habits he had before he was diagnosed.  The disorder did not affect his ability to shower, so he could still bathe himself.  His driver's license was reinstated, and the court noted driving was not a major life activity.  The court of appeals treated the limitations on stress and heights as being relevant to the major life activity of working, and the employee did not demonstrate these limitations prevented him from working a broad range of jobs.  The employee offered no evidence to show that social issues were substantially limited.  Id.  The Court of Appeals for the Third Circuit concluded that the employee failed to demonstrate a material issue of fact with respect to having a major life activity, which was substantially limited.  Id.

In Delgado v. Sears Holding Corp., No. 06 cv 6218, 2008 WL 4866619 (N.D. Ill. June 5, 2008), the plaintiff sued his employer because the employer did not offer him his full-time position back after he took medical leave for a seizure disorder.  Id. at *1.  The plaintiff suffered seizures at a frequency of twice a month to once every two months; the seizures lasted ten to twenty-five seconds.  After forty seconds, he returned to consciousness, and he suffered a severe headache for fifteen to twenty-five minutes.  Id. at *2.  Concerning his daily activities, the plaintiff could not take out the garbage if it was heavy, could not clean his house long enough for

him to tire, could not play sports, could not perform yard work, could not be outside for more than one hour if the temperature was greater than ninety degrees and it was humid, and could not work long hours.  He was also restricted in driving and lifting items more than ten, twenty, and twenty-five pounds.  <u>Id.</u>  The plaintiff took extended leaves of absence in 2001, 2002, 2003, 2004, and 2005, each of which lasted more than 150 days.  During his leave in 2005, the employer hired a new employee to perform the tasks assigned to the plaintiff's position.  Upon returning to work, the employer only offered the plaintiff a part-time position, even though he previously worked full time.  <u>Id.</u> at *1.  The employer moved for summary judgment, and the court determined that no issue of material fact existed over whether the plaintiff was disabled under the ADA.  The court emphasized that the ADA does not protect individuals with general medical conditions, but rather only protects those individuals with medical conditions that constitute disabilities under the ADA. "[E]ven a seizure disorder does not make a person disabled unless the condition substantially limits a major life activity." <u>Id.</u> at *4.  The plaintiff argued that during his seizures and the recovery periods immediately after, he could not perform a multitude of major life activities.  The court cited <u>Sara Lee</u>, and held that the limitations he experienced during the seizures, which never lasted in duration more than two minutes each month, did not substantially limit his major life activities in relation to the average person.  The plaintiff also argued he was substantially limited in activities on a continuous basis, but the court held that he was not substantially more limited than the general population in any one of these activities.  <u>Id.</u> at *4-7.

Plaintiff places primary reliance upon the <u>Rowles</u> decision for her argument that she is substantially limited.  Defendant argues <u>Rowles</u> is distinguishable, and defendant relies upon the <u>Sara Lee</u> and <u>Robinson</u> decisions.  In this case, plaintiff is continuously limited in several major

life activities, and becomes limited in certain activities during and immediately after her seizures. The court will analyze each of these limitations to determine whether they rise to the level of substantial limitations under the regulations.

On an everyday basis, plaintiff must limit her exposure to stress and fatigue, but she did not offer evidence about the extent to which these limitations affect her major life activities. For that reason, there is insufficient evidence to determine whether her limitations *significantly* restrict the condition, manner, or duration under which she can perform her major life activities as compared to the average person in the general population. Plaintiff argues she must not work excessively long hours, but she has not provided any detailed information about the maximum number of hours she can work and she testified that she regularly worked in excess of forty hours per week. The court concludes that this plaintiff did not adduce sufficient evidence to establish that her working was significantly limited in comparison to the average person. Plaintiff's requirement that she eat meals at regularly scheduled intervals restricts the condition and manner in which she can eat, but this is not a significant restriction compared to the general population. Eating has been considered substantially limited when a limitation impinges upon life-sustaining activity, but this situation is inapposite. See DeJesse v. First Judicial Dist. of Pennsylvania, No. 06-1682, 2007 WL 4336225, at *7 (E.D. Pa. Dec. 17, 2007). Plaintiff cannot work at heights, but plaintiff was able to be on the roof of the Mt. Pleasant restaurant. Just as in Robinson, there is no evidence that this limitation prohibited plaintiff from working a broad class of jobs. Similar to Popko, the requirement that plaintiff must sleep at least eight hours per night is not a significant restriction when compared to the average person.

In addition to the continuous limitations that plaintiff is subject to, she also experiences limitations of several major life activities during and following the grand mal seizures. During

the seizures, plaintiff cannot speak, walk, see, or hear. For twenty-four to forty-eight hours after her seizures, plaintiff's only limitations are in her ability to concentrate and walk. Plaintiff's seizures are unpredictable, but, in any event, the frequency of the seizures is low–plaintiff only had three seizures between August 2005 and May 2008. Taking all the relevant evidence into account, plaintiff did not present evidence that is sufficient for a reasonable finder of fact to determine she is substantially limited in comparison to the general population. During the thirty-four month time span between August 2005 and May 2008, plaintiff's abilities were limited for a maximum total of six days. While this time frame is clearly a limitation on plaintiff's major life activities, it is not a substantial limitation in comparison to the average person. The duration of the limitation is directly relevant to the second factor listed in 29 C.F.R.§1630.2(j)(2), and, in this situation, the short duration weighs heavily against it being a substantial limitation.

The court believes a reasonable finder of fact could not conclude that plaintiff's epilepsy substantially limited her in major life activities, and the evidence is insufficient to support a finding that she is disabled under the ADA.

### ii. Regarded as Impaired

In addition to arguing she has an actual impairment, plaintiff alleges that she is a disabled person under the ADA because defendant regarded her as disabled. To be regarded as disabled an individual must prove either that he or she:

> (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by [the employer] as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has [no such impairment] but is treated by [the employer] as having a substantially limiting impairment.

Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 187-88 (3d Cir. 1999) (quoting 29 C.F.R.§ 1630.2(*l*)).

In this case, plaintiff argues that Arby's regarded her as disabled because Cassidy told plaintiff that when he thinks of epilepsy he thinks of someone in a wheelchair. Cassidy also expressed concern over plaintiff's ability to drive and that he might need to hire another manager. Cassidy's statement that he thinks of wheelchair-bound individuals when he thinks of epileptics is not evidence that he believed plaintiff was substantially limited in her major life activities. There is no evidence that Cassidy thought plaintiff was in a wheelchair or that Cassidy regarded her as wheelchair-bound. As already explained, driving is not a major life activity, and therefore Cassidy's concern over plaintiff's ability to drive is not evidence that Cassidy regarded her as substantially limited in a major life activity. Cassidy's statement that he might need to hire another manager is evidence that he regarded plaintiff as limited in working her job at Arby's, but there was no evidence–and plaintiff makes no allegation–that Cassidy regarded her as limited in working other jobs. For plaintiff to be regarded as substantially limited in the major life activity of working, there must be evidence that defendant "regarded [plaintiff] 'as precluded from more than a particular job.'" Robinson, 212 F. App'x at 125. Plaintiff failed to offer such evidence here.

Viewing the disputed facts and drawing all reasonable inferences in favor of plaintiff, the court concludes that plaintiff did not adduce sufficient evidence that she was regarded as disabled. Because plaintiff failed to produce sufficient evidence that she has either an actual impairment or was regarded as having an impairment, plaintiff did not create a genuine issue of material fact with respect to the first element of her prima facie case. Since plaintiff cannot prove a prima facie case, summary judgment must be granted in defendant's favor.

## B. ADA and PHRA Retaliation Claims (counts four and six)

In addition to asserting disability discrimination claims under the ADA and PHRA, plaintiff also asserted retaliation claims under the ADA and PHRA.[8]  Plaintiff alleges she was retaliated against for requesting future time off due to her epilepsy.

### 1. Prima Facie Case

The court must analyze a retaliation claim under the ADA using the same framework employed for retaliation claims arising under Title VII.  Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997).  In order to establish a prima facie case of retaliation under the ADA, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Id. (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 231-32 (3d Cir. 2007) (citing Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006)); see Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  In Burlington Northern, the United States Supreme Court held that under the anti-retaliation provision of Title VII, employer actions are materially adverse if the actions are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 57.  Just as in plaintiff's FMLA retaliation claim, there is no dispute that the termination of plaintiff's employment is an adverse action for purposes of the second element.  The parties dispute the evidence with respect to the first and third elements of plaintiff's prima facie case.

---

[8] Retaliation claims under the ADA and PHRA are analyzed under the same standard as a Title VII retaliation claim. See Sterling v. McKesson Automation, Inc., No. 02:04cv1470, 2006 WL 2792203, at *9 (W.D. Pa. Sept. 26, 2006). As already noted, the disposition of the ADA claims will be applicable to the PHRA claims.

### a. Protected Activity – First Element

There is a genuine issue of material fact with respect to whether plaintiff meets the first requirement. Plaintiff argues she engaged in a protected activity under the ADA by requesting time off work due to her epilepsy to undergo testing and possible treatment. A leave of absence for medical testing or medical care "may constitute a reasonable accommodation under the ADA." Wilson, 159 F. Supp. 2d at 201. A request for a reasonable accommodation is a protected activity under the ADA. See Williams v. Philadelphia Hous. Auth. Police Dept., 380 F.3d 751, 759 n.2 (3d Cir. 2004) (employee argued he was retaliated against for requesting a reasonable accommodation); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 190-91 (3d Cir. 2003) (holding that the ADA protects an employee who makes a good faith request for an accommodation).[9] Defendant argues that plaintiff did not engage in a protected activity because she did not request leave for a specific period. As discussed earlier, plaintiff's request provided satisfactory notice to defendant under the FMLA. For similar reasons, the request provided

---

[9] In defendant's motion, defendant challenged plaintiff's evidence with respect to the first element of her prima facie case of disability discrimination. For the reasons already set forth, plaintiff did not adduce sufficient evidence that she is disabled within the meaning of the ADA. This does not, however, preclude plaintiff from asserting a retaliation claim under the ADA. The court of appeals made clear that the ADA protects even individuals who are not disabled from retaliation for engaging in protected activity under the ADA. See Shellenberger, 318 F.3d at 188 ("At the outset of our discussion, we note that [the plaintiff's] failure to establish that she was disabled does not prevent her from recovering if she can establish that her employer terminated her because she engaged in activity protected under the ADA"). The ADA's protection extends to retaliation for requesting a reasonable accommodation, as the court of appeals stated in Williams:

> [u]nlike a claim for discrimination under the ADA, an ADA retaliation claim based upon an employee having requested an accommodation does not require that a plaintiff show that he or she is 'disabled' within the meaning of the ADA. "The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC, and we have already explained that the ADA protects one who engages in the latter activity without regard to whether the complainant is 'disabled.'" Thus, as opposed to showing disability, a plaintiff need only show that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested.

380 F.3d at 179 n.2 (quoting Shellenberger, 318 F.3d at 191). Defendant did not challenge whether plaintiff had a reasonable, good-faith belief that she was entitled to request the accommodation of leave. Defendant only challenged plaintiff's alleged protected activity on the basis that her request was not specific enough to put defendant on notice.

proper notice under the ADA as well. Under the ADA, the employee need only provide the employer with notice of the disability and the desired accommodation, and make clear the accommodation is for the disability:

> The employee bears the responsibility of initiating the interactive process by providing notice of her disability and requesting accommodation for it. [Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)]. The employee's request need not be written, nor need it include the "magic words 'reasonable accommodation,'" [but] the notice must nonetheless make clear that the employee wants assistance for his or her disability." Id.

Peter v. Lincoln Technical Inst., Inc., 255 F. Supp. 2d 417, 437 (E.D. Pa. 2002). The notice requirements under the ADA are nearly identical to those under the FMLA, and plaintiff adduced sufficient evidence that she complied with those requirements.

### b. Adverse Employment Decision Was Causally Related to Plaintiff's Protected Activity – Third Element

The third element of the prima facie case for retaliation requires the plaintiff to establish a causal link between the adverse employment decision and the protected activity. Identical to the argument raised with respect to plaintiff's FMLA claim, defendant argues plaintiff did not offer evidence that the decision to terminate plaintiff's employment was casually related to her notification that she possibly needed time off for testing and treatment. The court already determined that plaintiff adduced sufficient evidence to for a reasonable finder of fact to determine a casual connection between her request and the termination of her employment.

### 2. Burden-Shifting

After a plaintiff adduced enough evidence to establish a prima facie case, the burden is on the defendant to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." Fuentes, 32 F.3d at 763. As previously discussed, defendant alleges plaintiff violated its RESPECT policy,

and was terminated for that reason.  The court concludes defendant met its relatively light burden to offer a legitimate, nondiscriminatory reason for terminating plaintiff.

The final part of the <u>McDonnell Douglas</u> framework requires a plaintiff to demonstrate that the defendant's stated reason for her termination was a pretext for discrimination.  Here, plaintiff adduced sufficient evidence to satisfy the first-prong of the pretext analysis under <u>Fuentes</u>.  The evidence plaintiff offered that could establish that Arby's legitimate business reason for terminating plaintiff's employment was a pretext for retaliating against her in violation of the FMLA, can likewise establish that the stated business reason is a pretext for retaliating against her in violation of the ADA.  Since defendant's articulated reason for its employment decision has not changed, the evidence already discussed likewise shows weaknesses and inconsistencies with defendant's alleged reason.  <u>See</u> <u>supra</u> Part I.C.2-3.  For all the reasons previously discussed, the court finds the evidence sufficient to create a material issue of triable fact.

*Conclusion*

After considering the undisputed material facts of record, viewing all disputed facts in favor of the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the motion for summary is granted in part and denied in part for the above stated reasons. With respect to plaintiff's interference claim under the FMLA (count one) and her disability discrimination claims under the ADA and PHRA (counts three and five), defendant's motion for summary judgment is granted. With respect to plaintiff's FMLA retaliation claim (count two) and ADA and PHRA retaliation claims (counts four and six), defendant's motion for summary judgment is denied.

By the court:
/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: March 16, 2009